## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **FLOYD A. HUDGINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-CV-232-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Floyd A. Hudgins ("Hudgins"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Hudgins appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Hudgins was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**[1]

Hudgins was 53 years old at the time of the hearing before the ALJ on May 8, 2012.  (R. 32, 35, 38).  Hudgins testified that he had a commercial driver's license and he had last worked in January 2010 when he was laid off.  (R. 38).  Hudgins testified that, in January 2010, he could have performed some work, but he was going to the doctor a lot because of "spurs" in his neck.  (R. 38-39).  He testified that he had previously filed a worker's compensation claim, but he had dropped that claim in return for his employer hiring him to do alternative work as a night sweeper.  (R. 41-42).  After he was laid off from the night sweeper job, he filed for unemployment benefits, and he considered himself available and willing to do a job that was within his capabilities.  (R. 39-43).  Hudgins said that his commercial driver's license included a restriction due to blindness in his left eye.  (R. 40).

Hudgins testified that he had bypass surgery in September 2011, and he found himself to be more short of breath after that surgery.  (R. 43-44).  He had difficulty walking a quarter of a mile.  *Id.*  His chest still hurt from the surgery, and he thought he could only lift about 20 pounds due to that residual pain.  (R. 44).  He thought that he could stand for about 10 or 15 minutes before needing to sit down due to pain in his neck.  (R. 44-45).  He could probably sit for about 45 minutes before he would be too uncomfortable due to pain in his low back, his shoulders, and his neck.  (R. 45-46).  He ranked his pain in his low back and neck at about five or six on a scale of one to ten, but the pain in his left shoulder at times was an eight or nine on that scale.  (R. 46).  Pain made it difficult to concentrate.  (R. 51).  He testified that taking prescription pain pills

---

[1] Hudgins was evaluated by agency consultants for mental impairments.  (R. 348-61, 370-83).  Because the issues raised by Hudgins before this Court relate solely to physical impairments, the Court omits any summary of these reports relating to mental impairments.

before bed usually allowed him to get six or seven hours of sleep. *Id.* He avoided taking the pills during the day if he could, and he did not want to drive after taking the pills. (R. 46-47).

Hudgins testified that sometimes he would have to take his pain medications during the day if he engaged in a lot of physical activity. (R. 51-52). One example Hudgins gave was a grocery shopping trip of one and a half hours that would require walking, loading, and unloading. *Id.* He had driven himself to the hearing, and three weeks before the hearing, he had driven to Springfield, Missouri, to a family function. (R. 47). He had stopped in Joplin to walk around, and soreness from driving would make him need to stop as he did on that trip. (R. 54).

Because of his problems with his left shoulder, Hudgins could not do activities over his head. (R. 52). He had a hard time doing something like working on the motor of his car. *Id.* His neck pain made it difficult to turn his head to the left. (R. 53). His left hand didn't usually hurt, but the pain would go into his hand if he did too much with that hand. *Id.*

Hudgins testified that his physicians were going to implant a permanent defibrillator one month after the hearing. (R. 48). He experienced palpitations about three or four times a week for about one minute in duration. (R. 48-49). When those occurred, he would sit down and relax, because there was nothing else to do for them. *Id.* He thought stress was the usual reason for an episode. (R. 50).

Hudgins had been hospitalized several times, and he could not tolerate heat as well as he could when he was younger. (R. 54-55). During his last surgery, a vein had been taken from his leg, and he had lost some sensation in the leg. (R. 55).

Some of his medications made him feel over-stimulated, so he tried to manage that side effect by taking the medications at certain times. (R. 49).

Hudgins testified that he shared household chores with a woman who owned the house where he lived.  *Id.*

Hudgins was treated by David A. Traub, M.D. for pain management from March 2009 to September 2009.  (R. 209-19).  He received a steroid injection to "the area around the suprascapular nerve" on March 17, 2009.  (R. 218).  That injection did not ease Hudgins' pain, and he returned to Dr. Traub on March 19, 2009 and received an epidural steroid injection at right C6/C7.  (R. 215).  He received the same injection on March 23, 2009, and the same injection, but on the left side, on June 30, 2009 and September 15, 2009.  (R. 210-11, 214).

On February 10, 2009, Hudgins was admitted to Saint Francis Hospital for outpatient diagnostic left heart cardiac catherization.  (R. 311-22).  On February 16, 2009, Hudgins had percutaneous transluminal coronary angioplasty ("PTCA") and stenting of the right coronary artery.  (R. 298-310).

On February 25, 2009, Hudgins presented to the emergency room at Saint Francis Hospital with an acute inferior wall myocardial infarction.  (R. 269-97).  He was discharged on March 2, 2009, and discharge diagnoses were: 1) ischemic heart disease, coronary artery disease, acute inferior wall myocardial infarction; 2) primary angioplasty of right coronary artery; 3) smoking abuse; 4) severe hypercholesterolemia; 5) hypertension; and 6) noncompliance.  (R. 270).

Hudgins saw Bryan Lucenta, M.D. on April 22, 2009 for chest and arm pain that had been continuing since a myocardial infarction following a stent implant six to eight weeks earlier.  (R. 222-23).  Dr. Lucenta's assessments were crescendo angina; secondary dilated cardiomyopathy; coronary atherosclerosis of native vessel; status post PTCA; hyperlipidemia; and hypertensive heart disease without heart failure.  *Id.*  Dr. Lucenta prescribed an additional medication to

4

Hudgins and noted under procedures "L/cath poss PCI." *Id.* On April 24, 2009, Dr. Lucenta performed several procedures including four instances of "successful balloon angioplasty with stent." (R. 224-29, 259-68). Dr. Lucenta noted a recommendation that Hudgins' treatment "should include aggressive medical therapy." (R. 227).

John S. Marouk, D.O. with Neurosurgical Specialists of Tulsa, Inc. completed a neurosurgical consultation of Hudgins on June 5, 2009. (R. 385-86). Hudgins' chief complaint was chest pain and left arm pain. *Id.* On examination, Spurling's test was positive for neck, shoulder, and arm pain. (R. 386). He had mild weakness of his left tricep muscle and a diminished left tricep reflex. *Id.* On Dr. Marouk's recommendation, a cervical myelogram was performed June 10, 2009. (R. 255-57). This test showed mild spondylosis and bulging disk at the C5/C6 level and was otherwise an unremarkable evaluation of the cervical spine. On June 15, 2009, Dr. Marouk gave the opinion that the disk osteophyte complex shown by the CT scan at the C5/C6 level was the source of Hudgins' symptoms. (R. 592).

Dr. Lucenta saw Hudgins on July 14, 2010 for "clearance for DOT," and Hudgins reported no chest pain, no shortness of breath, no dizziness, and no swelling in his legs or feet. (R. 230). Dr. Lucenta's assessments were coronary atherosclerosis of native vessel; hyperlipidemia; and status post PTCA. *Id.* He started Hudgins on additional medications. *Id.*

On December 29, 2010, Hudgins presented to the emergency room at Saint Francis Hospital with significant chest discomfort. (R. 242-53). Hudgins was diagnosed with acute anteroseptal myocardial infarction. (R. 243). Dr. Lucenta performed an additional procedure. (R. 231-36). He noted that Hudgins' global left ventricular function was severely depressed, and he estimated the ejection fraction to be 30%. (R. 231). He performed a successful balloon

angioplasty with stent of the left anterior descending artery.  *Id.*  Hudgins was discharged from the hospital on December 31, 2010.  (R. 242).

Richard A. Hastings, II, D.O., Ph.D. completed an examination of Hudgins and report to Hudgins' worker's compensation attorney on March 24, 2011.  (R. 390-402).  Dr. Hastings gave the opinion that Hudgins had sustained a repetitive cumulative trauma from his job through his last day of work on January 14, 2010, with injury to his cervical spine, thoracic spine, lumbar spine, left shoulder, left arm/elbow and left hand and wrist.  (R. 397).  Dr. Hastings made recommendations for further diagnostic testing.  (R. 398-401).

On May 17, 2011, William R. Gillock, M.D. examined Hudgins and gave an opinion apparently to the worker's compensation attorneys for Hudgins' former employer that Hudgins had no work-related injuries.  (R. 410-17).

Hudgins presented to the emergency room at Saint Francis Hospital on August 30, 2011. (R. 418-579).  He was transferred to the Veterans Administration Medical Center in Oklahoma City (the "VA Center") on August 31, 2011.  *Id.*  A coronary artery bypass surgery was completed at the VA Center on September 9, 2011.  (R. 418-564).  He was discharged on September 13, 2011 and seen for routine post-operative  appointments in September and October.  (R. 418-564, 580-84).

The administrative transcript contains some correspondence that appears to indicate that Hudgins had appointments at the VA Center scheduled for June 2012 for arrhythmia consultation and possible consideration of an implanted cardiac device.  (R. 594-96).

Agency consultant Timothy W. Winter, D.O. completed an examination of Hudgins on April 8, 2011.  (R. 338-44).  Hudgins' chief complaint was left upper extremity pain and dysfunction.  (R. 338).  On examination, Hudgins had some neck pain with range of motion.  (R.

339).  He had full range of motion of his spine.  (R. 339).  His lungs had "diffuse wheezes and rhonchi to ant/post fields on both sides."  *Id.*  Dr. Winter's assessments were 1) left upper extremity pain and dysfunction; 2) cardiac artery disease with 5 myocardial infarctions; 3) high cholesterol; 4) tobacco abuse; and 5) status post 11 cardiac catheterizations and skin grafts to the right upper extremity and right flank/chest/back.  (R. 339-40).  On the backsheet form that accompanied Dr. Winter's report, he noted that Hudgins had positive straight leg raising on his left side when lying down.  (R. 342).  Regarding the cervical spine, Dr. Winter noted that Hudgins had pain rotating his head to the left together with tenderness on the left side.  *Id.*

An echocardiogram completed on April 27, 2011 by an agency consultant reflected that Hudgins' left ventricular ejection fraction was visually estimated at  20-25%, and there was "apical akinesis."  (R. 346-47).  The remainder of the heart appeared to be normal in structure and function.  *Id.*

A pulmonary function study was completed at the request of the agency on April 28, 2011.  (R. 585-90).  The report stated that there was "a minimal obstructive lung defect."  (R. 585).

Nonexamining agency medical consultant, James Metcalf, M.D., completed a Physical Residual Functional Capacity Assessment on May 17, 2011.  (R. 362-69).  Dr. Metcalf indicated that Hudgins could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds.  (R. 363).  He found that Hudgins could stand and/or walk for about 6 hours in an 8-hour workday and could sit for about 6 hours in an 8-hour workday.  *Id.*  For narrative explanation, Dr. Metcalf noted the June 9, 2010, CT scan of Hudgins' cervical spine and the December 29, 2010, hospitalization for myocardial infarction.  (R. 363).  He noted Hudgins' long history of cardiac issues and interventions.  *Id.*  Dr. Metcalf summarized the findings of Dr. Winter.  (R. 363-64).

He noted the results of the pulmonary function study completed on April 28, 2011.  (R. 364).  He

summarized Hudgins' reported activities of daily living.  *Id.*  For manipulative limitations, Dr.

Metcalf found that Hudgins was limited to no overhead reaching or lifting on his left side.  (R.

365).  Dr. Metcalf found no postural, visual, communicative, or environmental limitations were

established.  (R. 364-69).

## Procedural History

Hudgins filed an application on January 28, 2011, seeking disability insurance benefits

under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  (R. 121-23).  Hudgins alleged

onset of disability as January 14, 2010.  (R. 121).  The application was denied initially and on

reconsideration.  (R. 70-74, 84-86).  A hearing before ALJ Edmund C. Werre was held May 8,

2012 in Tulsa, Oklahoma.  (R. 32-63).  By decision dated May 25, 2012, the ALJ found that

Hudgins was not disabled.  (R. 19-26).  On February 25, 2013, the Appeals Council denied

review of the ALJ's findings.  (R. 1-4).  Thus, the decision of the ALJ represents the

Commissioner's final decision for purposes of this appeal.  20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[2]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Lax*, 489 F.3d at 1084 (citation

and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Wall*, 561 F.3d at 1052 (quotations and citations omitted).  Although the

court will not reweigh the evidence, the court will "meticulously examine the record as a whole,

including anything that may undercut or detract from the ALJ's findings in order to determine if

the substantiality test has been met."  *Id.*

---

[2] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Hudgins met insured status requirements through December 31, 2014.  (R. 21).  At Step One, the ALJ found that Hudgins had not engaged in any substantial gainful activity since his asserted onset date of January 14, 2010.  *Id.*  At Step Two, the ALJ found that Hudgins had severe impairments of "degenerative disk disease, coronary artery disease, status post stenting and bypass grafting, and bilateral tinnitus."  *Id.*  At Step Three, the ALJ found that Hudgins' impairments did not meet a Listing.  (R. 22).

The ALJ determined that Hudgins had the RFC to perform light work with additional limitations of no overhead reaching with the left arm, no exposure to temperature or humidity extremes, no exposure to inhaled irritants such as gases, fumes, or chemicals, and no exposure to an environment with a loud noise level.  (R. 22).  At Step Four, the ALJ found that Hudgins was not able to perform any past relevant work.  (R. 24).  At Step Five, the ALJ found that there were significant numbers of jobs in the national economy that Hudgins could perform, taking into account his age, education, work experience, and RFC.  (R. 25).  Therefore, the ALJ found that Hudgins was not disabled from January 14, 2010 through the date of his decision.  (R. 26).

### Review

Originally, Hudgins asserted that he met Listing 4.04 at Step Three.  Plaintiff's Opening Brief, Dkt. #15, pp. 2-3.  The Court ordered both Hudgins and the Commissioner to submit additional briefs on this issue, because neither party had addressed the effect of a definitional provision, 20 C.F.R. pt. 404, Subpt. P, app. 1 § 4.00A3e.  Order for Supplemental Briefing, Dkt. #17.  In his supplemental brief, Hudgins has conceded that any error by the ALJ regarding Step Three is harmless.  Plaintiff's Supplemental Brief, Dkt. #19.  Thus, in effect, Hudgins has withdrawn the asserted issue as to Step Three.

Hudgins raised only one issue other than the withdrawn Step Three issue.  The second issue asserted by Hudgins is that "[t]he decision of the ALJ is inconsistent with the RFC given and therefore erroneous."  Plaintiff's Opening Brief, Dkt. #15, p. 3.  That heading is not illuminating, but the gist of the Hudgins' argument is that the RFC determination of the ALJ is inconsistent with his findings of severe impairments at Step Two.  *Id.*  He asserts that the ALJ "placed absolutely no limitations on Hudgins' work based on the heart-related impairments which include impairments from the graft site on the lower extremity and problems with fatigue and shortness of breath."  *Id.*  Hudgins also asserts that shortness of breath was documented by the pulmonary function study completed at the request of the agency.  *Id.*

The Court finds the assertion that the ALJ found no limitations due to Hudgins' heart-related impairments to be unavailing.  The ALJ limited Hudgins to light work, which Dr. Metcalf, the agency nonexamining consultant, found to be a necessary accommodation to Hudgins due to all of his impairments, including his heart-related impairments.  (R. 22, 363). Further, even though Dr. Metcalf did not include these as required limitations in his assessment, the ALJ limited Hudgins to avoiding exposure to extreme temperature or humidity and to inhaled irritants.  (R. 22).  Thus, the ALJ's RFC is more favorable to Hudgins than the assessment of Dr. Metcalf, and Dr. Metcalf's assessment is substantial evidence supporting the ALJ's decision.  *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Leach v. Astrue*, 470 Fed. Appx. 701, 704 (10th Cir. 2012) (unpublished) (ALJ's RFC determination was supported by substantial evidence when it was based in part on reports of both examining and nonexamining consultants).

Regarding the assertion that the ALJ included no limitations relating to the "graft site on the lower extremity," the ALJ included a summary of Hudgins' testimony related to the left leg in his discussion.  (R. 23).  Thus, the ALJ considered the evidence that was presented to him, and he was not required to include any specific limitations to address this asserted impairment. Hudgins appears to be arguing that the evidence regarding the graft site required the ALJ to find that he was limited to sedentary work, but he cites no authority for that proposition.  The ALJ's RFC, including his finding that Hudgins' had the ability to perform work at the light level, is supported by substantial evidence.

Finally, the ALJ also noted Hudgins' testimony that he suffered from shortness of breath. (R. 23).  Further, he referenced medical treating evidence that said that Hudgins did not suffer from shortness of breath and did not have congestive heart failure.  (R. 24).  The ALJ relied on Dr. Metcalf's assessment, and in turn Dr. Metcalf included the results of the pulmonary function study as part of his narrative explanation supporting his opinion that Hudgins was limited to work at the "light" exertional level.  (R. 24, 363-64).  The evidence regarding Hudgins' shortness of breath, including the pulmonary function study, did not require a finding that Hudgins was limited to sedentary work.  Again, the ALJ explicitly considered the evidence specified by Hudgins, and his decision is supported by substantial evidence, including Dr. Metcalf's assessment.

Hudgins' arguments are essentially a request that this Court reweigh the evidence, emphasizing the evidence that supports his disability claim, while discounting the evidence that does not support it.  The Court must decline this invitation.  *Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013).  While Hudgins' case might be susceptible to conclusions that differ from those made by the ALJ, it is not the Court's role to make findings in the first instance.

The possibility of drawing two inconsistent conclusions from the evidence does
not prevent an administrative agency's findings from being supported by
substantial evidence.  We may not displace the agency's choice between two fairly
conflicting views, even though the court would justifiably have made a different
choice had the matter been before it *de novo*.

*Lax*, 489 F.3d at 1084 (citations, quotations, and brackets omitted).  The Court will not engage in

impermissible reweighing of the evidence or substitution of its judgment for that of the

Commissioner.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.  The decision is **AFFIRMED**.

Dated this 14th day of February 2014.

Paul J. Cleary
United States Magistrate Judge